UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.: 15-237 (MJD/BRT)

| | |
|---|---|
| UNITED STATES OF AMERICA, | **FIRST SUPERSEDING INDICTMENT** |
| Plaintiff, | |
| v. | 18 U.S.C. § 371 (ILLEGAL EXPORT CONSPIRACY) |
| (1) USAMA DARWICH HAMADE, a/k/a "Prince Sam" Hamade, and | |
| (2) SAMIR AHMED BERRO, a/k/a "Tony," | |
| Defendants. | |

THE UNITED STATES GRAND JURY CHARGES THAT:

1.  At all times relevant to this First Superseding Indictment, defendant Usama Darwich Hamade was a citizen of Lebanon residing in the Republic of South Africa.

2.  At all times relevant to this First Superseding Indictment, defendant Samir Ahmed Berro was a citizen of both Lebanon and the United Kingdom of Great Britain and Northern Ireland who was residing either in Jordan or in Lebanon.

3.  At all times relevant to this First Superseding Indictment, defendant Samir Ahmed Berro controlled SAB Aerospace, a company domiciled and doing business in the United Arab Emirates.

4.  At all times relevant to this First Superseding Indictment, Hizballah was designated as a "foreign terrorist organization" by the United States Secretary of State pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C. Section 1189.

SCANNED
JUN 06 2017
U.S. DISTRICT COURT ST. PAUL

United States v. Usama Darwich Hamade, et al.

5.  At all times relevant to this First Superseding Indictment, Individual A was a citizen and resident of the Republic of South Africa who assisted Hamade and Berro with the illegal export scheme, but who did not fully understand the scheme's illegal purpose.

6.  At all times relevant to this First Superseding Indictment, Individual B was a resident of Arizona who unwittingly assisted Hamade and Berro with the illegal export scheme.

7.  Company A was a U.S. company, with operations in California, that manufactured and sold inertial measurement units suitable for use in Unmanned Aerial Vehicles (hereinafter "UAVs"). The inertial measurement units manufactured and sold by Company A included i) the Model MMQG Inertial Measurement Unit (the "Model MMQG IMU"); and ii) the Model C-MIGITS III Inertial Measurement Unit (the "C-MIGITS IMU") (hereinafter, collectively, the "IMUs").

8.  Company B was a U.S. company with significant operations in the State and District of Minnesota. These operations included, but were not limited to, the manufacture and sale of digital compasses, suitable to be paired with the IMUs manufactured and sold by Company A. The digital compasses manufactured in Minnesota by Company B, and shipped by Company B from Minnesota to customers, included the Digital Compass Solution HMR3000 compasses (hereinafter the "Digital Compasses"). When combined, the Digital Compasses and the IMUs together made an inertial guidance system suitable for use in UAVs.

2

CASE 0:15-cr-00237-JRT-BRT   Doc. 7-1   Filed 06/06/17   Page 3 of 10

United States v. Usama Darwich Hamade, et al.

9. Company C was an Indiana company that sold, among other items, small jet engines suitable for providing propulsion to UAVs. The jet engine models manufactured and sold by Company C included the TRS18 jet engine (the "Jet Engine").

10. Company D was a Florida company that sold, among other items, small piston engines suitable for providing propulsion to UAVs. The piston engines sold by Company D included the ZDZ-420-B4, a two-cylinder, four-stroke gasoline engine displacing 420 cubic centimeters (the "Piston Engines").

11. Company E was a Japanese company that manufactured and sold, among other items, binoculars, including the Model DEV-50 Recording Binoculars (the "Binoculars").

12. At all times relevant to this First Superseding Indictment, pursuant to authority granted by Congress in the International Emergency Economic Powers Act codified at Title 50, United States Code, Section 1701 *et seq.*, the United States Department of Commerce administered the Export Administration Regulations, codified at Title 15, Code of Federal Regulations, parts 730-774, which prohibited the export from the United States of certain goods and commodities to specific countries and organizations, absent permission from the United States Department of Commerce in the form of an export license.

13. At all times relevant to this First Superseding Indictment, Title 50, United States Code, Section 1705(c), provided that any person who willfully violates any provision of the Export Administration Regulations would be guilty of a felony.

14. At all times relevant to this First Superseding Indictment, the Export Administration Regulations prohibited the export of the Jet Engine from the United States to Lebanon for any purpose without first obtaining an export license from the United States Department of Commerce, and, because Hizballah was a designated foreign terrorist organization, imposed further prohibitions on the shipment of the Jet Engine to Lebanon to be used by Hizballah for any purpose without obtaining an export license from the United States Department of Commerce expressly authorizing Hizballah as an end user.

15. At all times relevant to this First Superseding Indictment, because Hizballah was a designated foreign terrorist organization, the Export Administration Regulations prohibited the export from the United States to Lebanon for use by Hizballah for any purpose of the Digital Compasses; the Model MMQG IMUs; the Piston Engines; and the Binoculars, without obtaining an export license from the United States Department of Commerce expressly authorizing Hizballah as an end user of these items (the Jet Engine, the Digital Compasses, the Model MMQG IMUs, the Piston Engines, and the Binoculars shall be referred to as the "Commerce-Controlled United States Goods").

16. At all times relevant to this First Superseding Indictment, the United States Department of State, pursuant to authority granted by Congress in the Arms Export Control Act, codified at Title 22, United States Code, Section 2751 *et seq.*, administered the International Traffic in Arms Regulations, codified at Title 22, Code of Federal Regulations, parts 120-130, which prohibited the export of "defense articles" from the

United States v. Usama Darwich Hamade, *et al.*

United States to, among other places, Lebanon, absent permission from the United States Department of State in the form of an export license.

17. At all times relevant to this First Superseding Indictment, Title 22, United States Code, Section 2778, provided that any person who willfully violates any provision of the International Traffic in Arms Regulations would be guilty of a felony.

18. At all times relevant to this First Superseding Indictment, the International Traffic in Arms Regulations prohibited the export to Lebanon of the C-MIGITS IMUs without obtaining an export license from United States Department of State expressly permitting its export to Lebanon.

## COUNT 1
## 18 U.S.C. § 371
(Conspiracy to Violate the International Emergency Economic Powers Act and the Export Administration Regulations, and to Violate the Arms Export Control Act and the International Traffic in Arms Regulations)

19. From in or about 2009 through at least December 2013, in the State and District of Minnesota and elsewhere, the defendants,

**USAMA DARWICH HAMADE,**
a/k/a "Prince Sam" Hamade, and
**SAMIR AHMED BERRO,**
a/k/a "Tony,"

did unlawfully, willfully and knowingly conspire, combine, and agree with each other and with other persons known and unknown to the Grand Jury to

(a) willfully violate the International Emergency Economic Powers Act and the Export Administration Regulations by exporting and attempting to export

from the United States to Lebanon and to Hizballah the Commerce-Controlled United States Goods without obtaining the required export licenses from the United States Department of Commerce, all in violation of Title 50, United States Code, Section 1705(c); and

(b)   willfully violate the Arms Export Control Act and the International Traffic in Arms Regulations by exporting and attempting to export to Lebanon a controlled defense article, namely, the CMIGITS IMU, without obtaining the required license from the United States Department of State expressly permitting its export to Lebanon, all in violation of Title 22, United States Code, Section 2778.

## PURPOSE OF THE CONSPIRACY

20.   The purpose of the conspiracy was to export parts and technology from the United States to Lebanon, and specifically to Hizballah, for inclusion in UAVs without obtaining the required export licenses under the Export Administration Regulations or under the International Traffic in Arms Regulations.

## MANNER AND MEANS

21.   It was part of the conspiracy that in October 2009, defendant Hamade directed Individual A to order the Jet Engine from Company C in the State of Indiana for delivery to defendant Berro at his company, SAB Aerospace, in the United Arab Emirates. Defendant Berro then illegally transshipped the Jet Engine to Hizballah coconspirators in Lebanon. Neither defendant Hamade nor defendant Berro obtained an export license from

the United States Department of Commerce before shipping the Jet Engine to the United Arab Emirates, Lebanon, or Hizballah.

22. It was part of the conspiracy that, from in or about October 2009 through August 2010, defendant Hamade directed Individual A to place orders for the Digital Compasses and the IMUs for delivery to the Republic of South Africa.

23. It was part of the conspiracy that defendant Hamade falsely told Individual A that the Digital Compasses and the IMUs would be used in UAVs in South Africa to overfly wildlife areas to prevent poaching.

24. It was part of the conspiracy that Hamade instead illegally transshipped the Digital Compasses and the IMUs to coconspirators in Lebanon and Hizballah without obtaining an export license from the United States Department of Commerce.

25. It was part of the conspiracy that, in March and May 2010, Hamade directed Individual A to order two CMIGITS IMUs from Company A without telling Individual A that Hamade intended to send the CMIGITS IMUs to Lebanon and Hizballah after receiving them in South Africa. As a consequence, Individual A obtained an export license from the United States Department of State which permitted the export of the CMIGITS IMUs to South Africa, but which did not expressly permit their export to Lebanon or to Hizballah, and in fact prohibited their re-export from South Africa without further authorization.

26. It was further part of the conspiracy that, between November 19, 2009 and April 13, 2010, defendant Berro caused Company E to ship 20 Piston Engines, in four

separate shipments, first from the State of Florida to another state (in one case, Minnesota), then from that other state to a temporary recipient in Frankfurt, Germany, and thence to SAB AEROSPACE in the UAE, which Berro then illegally transshipped to Lebanon and Hizballah.

27.  It was further part of the conspiracy that, in December 2013, Hamade directed Individual B to send the Binoculars to Lebanon and Hizballah via live courier, who flew from Los Angeles to Beirut to make the delivery.

## OVERT ACTS

28.  In furtherance of the conspiracy and to achieve its objects, the defendants committed, directly, through coconspirators, and through Individual A, among other acts, the following overt acts:

29.  On or about September 29, 2009, Individual A ordered, at defendant Hamade's direction, ten Digital Compasses from Company B, which shipped them overseas from the district of Minnesota.

30.  On or about October 12, 2009, Individual A ordered, at defendant Hamade's direction, the Jet Engine from Company C.

31.  On or about October 12, 2009, Individual A ordered, at defendant Hamade's direction, the Jet Engine from Company C.

32.  On or about October 20, 2009, Individual A ordered, at defendant Hamade's direction, eleven Model MMQG IMUs from Company A.

33. On or about October 20, 2009, Individual A ordered, at defendant Hamade's direction, 10 C-MIGITS IMUs from Company A.

34. On or about October 21, 2009 the Jet Engine arrived at defendant Berro's company, SAB Aerospace, in the United Arab Emirates. On or about October 24, 2009, defendant Berro caused the Jet Engine to be shipped from SAB Aerospace to Hizballah in Lebanon.

35. On or about December 1, 2009, Berro caused Company D to ship 5 Piston Engines to a temporary recipient in Germany, who shipped the engines onward to SAB AEROSPACE and thence to Hizballah.

36. On or about December 7, 2009, Berro caused Company D to ship 5 Piston Engines to a temporary recipient located in the State of Minnesota, which then shipped the engines onward to another temporary recipient located in Germany, which shipped the engines onward to SAB AEROSPACE and thence to Hizballah.

37. On or about April 13, 2010, defendant Berro caused Company D to ship 10 Piston Engines from Sarasota, Florida to Miami, Florida, and thence to a temporary recipient in Germany, which then shipped the 10 Piston Engines to SAB AEROSAPCE and thence to Hizballah.

38. On or about December 3, 2013, Individual B, at defendant Hamade's direction, sent one pair of the Binoculars to a United States person located in California, who then, at Hamade's direction, couriered the Binoculars to Lebanon and delivered them to Hizballah.

All in violation of Title 18, United States Code, Section 371.

A TRUE BILL

_____    _____
ACTING UNITED STATES ATTORNEY   FOREPERSON